850 A.2d 440

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ANTHONY WAYS, DEFENDANT–APPELLANT.

Argued February 18, 2004—Decided June 22, 2004.

*Alan Dexter Bowman* argued the cause for appellant.

*Anthony Ways* submitted a supplemental letter brief pro se.

*Michael J. Williams,* Deputy Attorney General, argued the cause for respondent (Attorney General of New Jersey, attorney).

Justice ALBIN delivered the opinion of the Court.

In 1991, defendant Anthony Ways was convicted of committing a murder during a botched armed robbery of two young men in a sports car trolling for drugs on the streets of Camden. At trial, Ways claimed that he was not at the scene of the crime and presented a witness who testified that Franklin King was the killer. Although Ways vigorously challenged the eyewitness testimony that implicated him in the murder, the jury rejected his defense. At a post-conviction relief hearing, Ways introduced "newly discovered" evidence offered by witnesses who gave accounts that tied King to the murder. The motion judge found two of those witnesses credible, but concluded that their testimony was "merely" impeaching and cumulative and did not entitle Ways to a new trial. The Appellate Division affirmed. We must determine whether that newly discovered evidence undermines our confidence in the verdict, thus compelling the grant of a new trial.

## I.

### *Trial*

#### *The Prosecution*

On Saturday evening, April 22, 1989, Wayne Hunter and John Weist attended a party in Haddon Township where they consumed cocaine, marijuana, and alcohol. At approximately 12:30 a.m., they left the party and drove in Hunter's green sports car, a Datsun 280Z, to Camden where they cruised the streets in search of more cocaine. Hunter, who was driving, stopped at two streets familiar to him from past drug purchases. When prospects at those locations did not look promising, Weist directed him to a

street corner where he had purchased drugs in the past. Weist, in the front passenger's seat, gave a hand signal to a person on the street, who approached the car, and told Hunter to pull over. That person then proceeded to an alleyway between a house and a bar on the other side of the intersection. He returned a short time later to the passenger side where Weist was seated, leaned into the open window, pointed a gun into the car, and yelled, "give me all your money." Weist then yelled, "go," and as soon as Hunter began to accelerate, the gun went off. The shot struck Weist in the heart. In a panicked flight, Hunter sped away, and at the end of the block collided with another car. Thereafter, he took his mortally wounded friend to JFK Hospital in Cherry Hill, where Weist was pronounced dead at 1:30 a.m.

At the hospital, a "shaken" Hunter spoke with Detective Latham of the Camden County Prosecutor's Office. Hunter agreed to accompany Latham and another officer in the detective's car to retrace the route to the street corner where his friend had been shot. According to Detective Latham, Hunter did not appear intoxicated or under the influence of drugs. Their travels brought them to the Time and Place Lounge on the corner of Chase and Louis Streets in Camden. Hunter told the detective that it was there that the shooting had occurred. Hunter remembered the bar because of the cyclone fence around it. Hunter, however, also recalled that the killer had retreated to an alleyway, but there was no alleyway next to the Time and Place Lounge.

That same day, Hunter gave a statement to the police in which he described the shooter as an eighteen- to nineteen-year-old black male with a small moustache and short hair, wearing an aqua green or turquoise-colored jacket or sweatshirt and maybe a knit hat. Hunter also described the shooter as about 6′ tall and weighing approximately 150 pounds, but added that he had a "big build." Hunter was 6′1″ and weighed about 150 pounds at the time, and acknowledged at trial that he would describe someone with those physical attributes as "thin." At the time of the incident, Ways was approximately 6′2″ and 225 pounds. On the

night in question, Hunter was not wearing his prescription glasses for near-sightedness, although he said he did not have difficulty seeing at close distances.

The following day, April 24, Detective Latham spoke with Hunter at his home and showed him an array of eight photographs. The photographs in the array did not expose enough of the individuals to allow for a judgment as to height or weight. Hunter picked out the picture of defendant Anthony Ways—the only person in the array wearing a hat—as the shooter.[1] He admitted that he was drawn to Ways's picture because he was wearing a hat. Hunter testified that he selected defendant's picture without hesitation as the person who "looked like what [he] remembered." Hunter, however, conceded that the shooter was only at the car's passenger window for a couple of seconds, that he did not get a "perfect look" at the shooter, and that the only illumination came from a street lamp and a bar across the street. Hunter's mother, who was present when her son viewed the photographic array, recalled that he had no hesitation in making an identification. Diane Cowan, a private investigator for the defense, testified that she interviewed Hunter's mother, who stated that her son was not sure that he had "pointed the right guy out" from the photographic array. The prosecutor never asked Hunter to identify Ways as the shooter in the presence of the jury.

The State's other eyewitness, Donna Carter, gave conflicting accounts of the shooting on the corner of Louis and Chase Streets in the early hours of April 23. Carter testified that sometime on April 22, she had purchased cocaine on the corner of Louis and

---

[1] On direct appeal, in deciding the admissibility of the identification, the Appellate Division found that the photo array was suggestive because Ways was the only person wearing a knit hat. Nevertheless, the panel determined that under the totality of the circumstances the identification was reliable, given that the shooter was only a few feet away, a street light from across the street provided sufficient light, and Hunter's description showed sufficient attention to detail.

Chase Streets from someone she knew as "Mancakes," an apparent nickname for Ways, whose real name she did not know. She smoked crack cocaine that day and, while under the influence, returned to the same street corner at 12:30 a.m. in the hope of buying more drugs. She saw an average-sized white or light blue car with white occupants pull up to the corner and stop on Louis Street. Two unidentified individuals approached the car and left, walking around the corner. One of the two then returned and fired a gun into the vehicle.

That less than detailed account differed from a statement given by Carter to Detective Latham on May 2, a week and a half after Weist was killed. Latham took the statement from Carter after she told her probation officer that she had information about the shooting. On probation for a welfare fraud conviction, Carter had read about the shooting in one of the local newspapers. Carter told Latham she saw "Mancakes," and a person named "Braheem," codefendant Bryant Anderson's nickname, approach a car that had pulled up to purchase drugs. Mancakes, who was wearing a hat, and Braheem, who was wearing a hood, were given money and then left. When they returned to the car, Carter saw "a gun go into the car" and the "car take off," at which point she heard a big blast. She could not say who was holding the gun. Although Carter did not know either Mancakes or Braheem "very well," she had purchased drugs from them. Carter estimated Mancakes to be twenty-five years old and "short," about 5'6" or 5'7". Detective Latham displayed to Carter the same photographic array viewed by Wayne Hunter, which included the picture of Anthony Ways. She did not identify any of the individuals in the array as the shooter. Carter was not asked to identify Ways in court.

On cross-examination, Carter stated that Ways was not beside the car at the time the shot was fired. Carter also stated that during the evening of April 22, she spoke with a drug dealer named Franklin Shaw at Louis and Thurman, the very location where Shaw claimed he saw Franklin King fire a gun into a sports

car. Carter admitted that she frequented the area of Louis and Thurman Streets, and had purchased drugs there in the past.

Todd Johnson, a friend of Anthony Ways, testified that he saw Ways at the Time and Place Lounge on Louis and Chase Streets sometime between 7:00 and 8:00 p.m. on April 22, and that Ways spoke about attending a party at his uncle's house that evening. When Johnson left the bar between 12:00 a.m. and 12:30 a.m., Ways was still there.

Margaret Witcher, a bartender, worked the 7:00 p.m. to 3:00 a.m. shift at the Time and Place Lounge on April 22–23. She recalled that Ways and Anderson were at the bar that evening and left around 2:00 or 2:15 a.m., although she acknowledged on cross-examination that she could have had the wrong day because both were regulars at that establishment. Witcher did not hear any gunfire that evening.

At approximately 12:30 a.m., Hector Cintron was driving on Mount Ephraim Avenue when a sports car (Hunter's Datsun) ran a red light coming out of Chase Street and broadsided his vehicle. Cintron, who had convictions for a drug offense and two property crimes, stated that he turned his car around and gave chase for three or four blocks until he lost the speeding car. Cintron reported the accident to the police as occurring at the intersection of Mount Ephraim Avenue and Chase Street, one block down from the Time and Place Lounge. The prosecution posited that the location of the accident was consistent with Hunter's wild flight from the scene of the shooting.

Detective Fred Fitzpatrick, a Voorhees Township Police Officer assigned to the Drug Task Force of the Camden County Prosecutor's Office, assisted in the arrest of Anthony Ways on Louis Street on April 25, 1989. According to Fitzpatrick, when taken into custody, Ways said, "this must be about that body or something they found" and asked, "how long have you been looking for me?" Then, upon learning that Fitzpatrick was a narcotics officer, Ways said, "since you're from Narcotics, you have the wrong

person. I have nothing to worry about." Codefendant Bryant Anderson was arrested separately.

At the time of his arrest, Ways was wearing an aqua or turquoise-colored suede jogging suit with red trim. Hunter later identified the jacket as the one worn by the person who shot John Weist. A test of Ways's jacket revealed no gun powder residue or blood stains. A forensic expert for the prosecution testified that gun powder residue would be found on such an article of clothing only if the gun was discharged from a position lateral to the fabric and not if the shooter's arms were extended forward at the time of discharge. No latent fingerprints of any relevance to the investigation were lifted from Hunter's car.

The State also called Dr. Robert L. Catherman, an Assistant Medical Examiner for Camden County, who testified that the wound inflicted on the victim would have caused little blood splatter. Dr. Catherman concluded that the projectile found in Hunter's car and the injuries sustained by Weist were from a bullet fired from a .44 Magnum handgun.

*The Defense*

The defense theory was that the shooting occurred not on the corner of Chase and Louis Streets by the Time and Place Lounge, but two blocks north on the corner of Thurman and Louis Streets by Wally's Bar. The Time and Place Lounge had the cyclone fence, but not the adjacent alleyway described by Hunter. Wally's Bar had the alleyway, but not the cyclone fence. Both Chase and Thurman Streets run in a parallel east-west direction and intersect with both Mount Ephraim Avenue and Louis Street, which run in a roughly parallel, north-south direction.

Franklin Shaw testified that the shooting of John Weist occurred outside of Wally's Bar by the corner of Louis and Thurman Streets. Shaw, who had known Ways for fifteen years, was serving a prison sentence for a drug conviction at the time of trial. In the early morning hours of April 23, Shaw was on the corner of Louis and Thurman when he observed a green Datsun Z sports car with two white occupants circling the area, finally stopping on

Louis Street. Franklin King, who was accompanied by his friend Ben Johnson, approached the car. King and Johnson were wearing dark-colored short troop jackets and baseball caps. Several minutes later, Shaw saw King fire a shot into the Datsun and the car speed away down Thurman Street. Shortly thereafter, Shaw heard King say that the Datsun "hit. somebody's fucking car." Shaw picked up a twenty-dollar bill from the street and went into Wally's Bar, where he recounted what he just had observed. Earlier that evening, King had displayed a .44 Magnum handgun to Shaw. Shaw identified King in court as the shooter.

Shaw admitted that he regularly sold drugs from the corner of Louis and Thurman Streets, occasionally using the alleyway adjacent to Wally's Bar to do business. Although a habitual drug user, Shaw stated that he was not high at the time he witnessed the shooting.

Shaw, as a drug dealer, presumably was disinclined to get involved with the police and did not report immediately what he had witnessed. However, two days later, when he "found out that the police picked up two innocent men and charged them with the crime," Shaw went to the prosecutor's office and told Detective Latham that King, armed with a .44 Magnum handgun, had fired the shot into the green Datsun on the corner of Thurman and Louis Streets. Because Shaw appeared under the influence of drugs, Detective Latham did not take a taped statement from him at that time. Shaw acknowledged that he was high on cocaine when he met with Detective Latham, but stated that he was 100 percent aware of what he was telling the detective. On May 2, Shaw gave a taped statement to Detective Latham that correctly identified the color and make of the Datsun and the race and number of occupants of the car. In that statement, Shaw stated that King "might have been five feet tall," but corrected himself in court, describing King as probably 5'4" or 5'5", noting, "he's short compared to me."

Richard Grayson testified that on the night of the shooting he was at Wally's Bar. He recalled hearing a "loud gunshot" and saw

a flash outside the window on Thurman Street. A few seconds later, Shaw entered the bar and reported that someone had just "wasted a white boy." Grayson, who was on parole at the time for a drug conviction, did not report what he had witnessed until he spoke with Detective Latham on May 5, 1989.

On the morning of April 23, 1989, Walter Rhymes, Jr., a bartender working at Wally's, heard a gunshot and saw the window facing Thurman Street light up. Rhymes testified that Shaw came into the bar and said that a "white boy" had been shot. Rhymes also did not call the police after the incident.

At the time of trial, Franklin King, who was serving a fifteen-year state prison term for armed robbery, stood approximately 5'7" and weighed 150 pounds. King testified that he committed armed robberies "probably once or twice a month" using .38 or .32 caliber guns with the usual victims being drug dealers. King admitted that, on the evening of April 22, he acquired a .44 Magnum revolver, loaded with six bullets, which he then hid on property off of Seventh Street in Camden. He claimed that when he went to his hiding place on April 24, the gun was missing.

On May 7, King was beaten and handcuffed by several young men, one of whom was armed, and brought to the house of a Camden Police Officer, Leonard Hall. The young men, members of the Hilltop Posse, a local gang, claimed that King was responsible for the shooting. King was then taken by officers to the station-house for questioning. King took the police to the place where he claimed to have stashed the .44 Magnum, but, of course, it was no longer there because it had been missing since April 24. At trial, King testified that on the night of April 22 he was with his good friend Ben Johnson, who at the time of trial was serving time with him for armed robbery, and that both men were at the house of a woman named Helena Schultz for the duration of the night. Schultz and Johnson testified and supported that alibi.

At the time of trial, Anthony Ways was on probation for possession and attempted distribution of a controlled dangerous substance. Ways testified that he did not shoot John Weist and

was not on the corner of Chase and Louis Streets on the morning of April 23, 1989. He explained his whereabouts on the night and morning of the shooting. On the evening of April 22, he, along with his brother, stepbrother, and his stepbrother's cousin, went to a party at his Aunt Portia's house to celebrate his Uncle Jerome's birthday. When they arrived, the party already had broken up. Later, other relatives appeared at the house. At trial, Ways stated that he arrived at dusk, around 6 p.m., but in an earlier statement he gave the time as 10 p.m. Aunt Portia testified that there was no prearranged party and that Ways arrived unexpectedly at her house, along with a fair amount of alcohol. Several of those present at Aunt Portia's house that evening testified that Ways left around midnight.

From his aunt's house, Ways called a friend, Angel Ferguson, and the two made plans to go to the movies. After leaving the party, Ways first drove his stepbrother's cousin home, next picked up Angel (she recalled the time was 11:15 p.m.), and then dropped off his brothers in the 1100 block area of Chase Street. Ways and Angel then went to a movie theater in Marlton, which was sold out. From there, Ways drove to a nearby motel. When Angel expressed a lack of interest in going inside, the two left and went to a pool hall, where they had something to eat. Afterwards, Ways took Angel home and drove to the Phase II bar, which had closed at 3:00 a.m. He then traveled to the Whippoorwill, an after-hours bar in Lawnside, arriving at approximately 3:30 a.m. There, for the first time that day, he saw co-defendant Bryant Anderson. Anderson also gave an account of his whereabouts that evening, confirming that he had not seen Ways all day until Ways arrived at the Whippoorwill between 3:00 and 3:30 a.m. Angel corroborated Ways's account of the evening, as well, testifying that when she arrived home she looked at the clock and the time was 3:00 a.m.

Anthony Ways and Bryant Anderson were charged in Camden County Indictment No. 378-1-90 with murder, in violation of *N.J.S.A.* 2C:11-3a (count one); felony murder, in violation of *N.J.S.A.* 2C:11-3a(3) (count two); second-degree conspiracy to

commit robbery, in violation of *N.J.S.A.* 2C:5–2 (count three); and first-degree armed robbery, in violation of *N.J.S.A.* 2C:15–1 (count four). Additionally, Ways was indicted for second-degree possession of a handgun for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4a (count five); third-degree unlawful possession of a handgun without a permit, in violation of *N.J.S.A.* 2C:39–5b (count six); third-degree distribution of cocaine, in violation of *N.J.S.A.* 2C:35–5a(1) and b(3) (count seven); third-degree tampering with witnesses, in violation of *N.J.S.A.* 2C:28–5a(2) (count eight); and third-degree hindering apprehension or prosecution, contrary to *N.J.S.A.* 2C:29–3b(1) (count nine). Anderson and Ways were tried together before a jury in 1991. The trial court dismissed counts seven, eight, and nine. The jury found Ways guilty of all counts except count three, conspiracy to commit armed robbery. Anderson was acquitted of all charges.

At sentencing, the trial judge merged felony murder into the murder conviction and merged unlawful possession of a handgun without a permit into the conviction for possession of a handgun for an unlawful purpose. The court imposed a term of life imprisonment with thirty years of parole ineligibility on the murder conviction, a consecutive twenty-year term with a ten-year period of parole ineligibility on the armed robbery conviction, and a concurrent ten-year term with a five-year period of parole ineligibility on the possession of a handgun for an unlawful purpose conviction. On March 11, 1993, the Appellate Division affirmed those convictions, but determined that the sentence on the armed robbery conviction should run concurrent with, rather than consecutive to, the other sentences. We denied certification. 134 *N.J.* 475, 634 *A*.2d 523 (1993).

In 1995, Ways filed a petition for post conviction relief (PCR) claiming that newly discovered evidence warranted a new trial and that trial counsel was ineffective for failing to request a cross-racial identification instruction or an identification charge tailored to the facts of the case. The PCR court held an evidentiary hearing on September 6 and 7, 2000.

## II.

### *Post–Conviction Relief Hearing*

At the PCR hearing, the defense presented a number of witnesses who gave testimony that the defense characterized as newly discovered evidence. We now summarize the testimony relevant to our consideration of the issues in this case.

### *Tyrone Williams*

Tyrone Williams testified that sometime between 2:00 a.m. and 3:00 a.m. on April 23, 1989, his brother, Habeeb, came to his house and informed him that someone wanted to speak with him. Williams walked outside and found Franklin King, who asked Williams if he wanted to buy a gun. At the side of the house, King displayed to him a blue steel, six-inch barrel .44 Magnum handgun with a wooden handle. Williams asked King if he had "any bodies on the gun at the time," to which he replied, "yes." According to Williams, King then stated

> that he shot somebody that night and I said that night and that's when he opened up—it was a revolver—he opened up the revolver part of the gun and showed me one spent shell in the gun. And I told him no I don't want it.

Williams, who had one prior conviction for larceny and one for drug distribution, testified that he was not a friend of Anthony Ways.

The PCR judge found Tyrone Williams to be credible, noting that Williams did not personally know Ways and "allegedly he has no axe to grind." He concluded, however, that the testimony was merely cumulative because Franklin Shaw had already identified King as the shooter at trial. The judge also concluded that testimony from Williams would be admissible at trial only to rehabilitate Shaw's credibility. Finally, the court held that there was no "likelihood or probability" that Williams's testimony "would change the jury's verdict if a new trial were granted."

### *Leonard Hall*

Leonard Hall, at the time retired from the Camden police department, testified that Franklin King was brought to his house

by a group of about eight to twelve young men, many of whom were members of the Hilltop Posse, a neighborhood gang that blamed King for the Weist shooting. At that time, before Hall had any information about the gun used in the crime, King stated, "I'm not the only one in Camden with a .44 Magnum." Hall called the Camden police and related that he might have a suspect in a homicide. A patrol officer was dispatched and brought King to the prosecutor's office, where King was questioned and released.

The basic facts surrounding the surrender of King to Officer Hall by the gang had been elicited at trial, but the alleged incriminating statement to Hall revealing King's knowledge of the type of gun used in the crime had not. None of the parties explored whether that evidence could have been discovered with reasonable diligence at the time of trial, and the PCR court did not address that issue. The PCR court found Hall's testimony credible, but concluded that King sufficiently explained the incriminating statement when he stated that, while being dragged to Hall's house, one of the members of the Hilltop Posse told him that a .44 Magnum was used in the shooting of Weist.

### Vincent Williams

Vincent Williams testified that he witnessed the shooting on the early morning of April 23, 1989, and that the shooter was not Anthony Ways. That morning, on the corner of Louis and Thurman Streets, Williams saw Ben Johnson and another person, whom he did not recognize as a familiar face in the area. Williams, who was standing on the corner across the street from the bar, saw the man with Johnson "running up to cars" trying to make a sale while Johnson stayed near the doorway of the bar. When a car pulled up on the street, Williams observed that same man, whom he described as brown-skinned, thin, and about 5'7", draw a gun and shoot into the car. Williams admitted that he had known Ways all his life; the two had lived on the same street.

Williams did not come forward to the police because he "was on the run" and did not want to get caught. Williams claimed that, while incarcerated in the county jail in 1989, he told prosecutors

that he was at the scene of the shooting and that Ways was not involved in the crime.

Because the PCR court began with the premise that the shooting occurred near the corner of Chase and Louis Streets, the court necessarily came to the conclusion that Williams's account was not believable. The court also found Vincent Williams incredible because he had "[e]mbellished his story to the point of disbelief" and "seemed to be making things up as he went along." The court was troubled by deviations between Williams's testimony and his affidavit. (In his testimony, Williams said that he saw the shot fired, whereas in his affidavit he said that he only heard the shot.) Last, the court discounted the testimony of Williams because of his life-long relationship with Ways.

### Thomas Ways

Thomas Ways, the cousin of Anthony Ways, testified that while he and Franklin King were in state prison and the county jail together, King twice admitted to him that he was responsible for the killing of Weist. The PCR court gave no weight to Thomas Ways's testimony because of his familial relationship with defendant.

### Franklin King

Franklin King made several statements that corroborated the testimony of other witnesses at the PCR hearing. He stated that he had admitted to killing John Weist to at least one other person. Nevertheless, King insisted at the hearing that he did not kill Weist. King also confirmed that around the time of the shooting he possessed a .44 Magnum, that he "tried to sell the gun to a few people," and that when asked by a prospective buyer whether there was "a body on the gun," he replied, there "might be." (According to King's trial testimony, he only possessed the gun from April 22, 1989, the day before the killing, to April 24, the day he discovered the gun was missing from its hiding place.) King testified that Anthony Ways was innocent of the crime, adding, "someone else did it. It wasn't this guy." In response to the court's question whether "he knew the trigger guy," King said, "I

do know who did it." In spite of that response, the court asked no follow-up questions requiring King to identify the shooter. During his testimony, King informed the court that the State was "charging [him] with three attempted murders" and that his lawyer had advised him against making any incriminating statements. The PCR court gave little weight to King's testimony, and noted that King did not provide a basis for his knowledge of the shooter's identity.

### Donna Carter

Donna Carter testified that she had falsely incriminated Ways in her initial taped statement to the police because she was "high" and afraid that she would be charged with drug possession, prostitution, and other offenses. Carter claimed that before she gave her taped statement, she was told what to say by the assistant prosecutor. She stated that at the time she only was interested in using drugs and "didn't want to get locked up for nothing and nobody." She also claimed that police officers planted eight bags of cocaine on her before she spoke with the assistant prosecutor, and then, presumably because of her cooperation, let her keep the drugs.

The PCR court rejected Carter's testimony as incredible, expressing "severe reservations about [her] candor" based on her demeanor and selective recall. The court also noted Carter's ten-year delay in coming forward with the purported truth and her first-time-ever allegation that the police planted drugs on her.

### Todd Johnson

Todd Johnson recanted his trial testimony in which he claimed that Anthony Ways was at the Time and Place Lounge on the evening of April 22–23, 1989. Johnson explained that he testified falsely because he believed he was providing his friend, Ways, with a safe alibi. He stated that he "rushed into something" too quickly in an attempt to help a friend. Johnson acknowledged that his false testimony had the result of wrongly implicating Ways in the crime by placing him at Chase and Louis Streets when in fact he was not there.

The Court rejected Johnson's testimony, noting that he "is an admitted liar" who changed his story at least three times.

### Anthony Ways

Anthony Ways testified that he did not participate in the killing of John Weist. Imploring the court, he stated, "I'll take a lie detector test. I'll go under hypnosis. Whatever it takes to show in court that I did not commit this murder...."

## III.

### A.

The court denied the petition for post-conviction relief. The Appellate Division affirmed in an unreported opinion. We granted certification, 178 *N.J.* 28, 834 *A.*2d 402 (2003), and now reverse.

### B.

In his PCR petition, Ways submits that he is entitled to a new trial because of newly discovered evidence that places in doubt the integrity of his conviction for murder. To meet the standard for a new trial based on newly discovered evidence, defendant must show that the evidence is 1) material, and not "merely" cumulative, impeaching, or contradictory; 2) that the evidence was discovered after completion of the trial and was "not discoverable by reasonable diligence beforehand"; and 3) that the evidence "would probably change the jury's verdict if a new trial were granted." *State v. Carter,* 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981). We have held that all three prongs of that test must be satisfied before a defendant will gain the relief of a new trial. *Ibid.; State v. Artis,* 36 *N.J.* 538, 541, 178 *A.*2d 198 (1962) (citing *State v. Johnson,* 34 *N.J.* 212, 223, 168 *A.*2d 1, *appeal dismissed,* 368 *U.S.* 145, 82 *S.Ct.* 247, 7 *L.Ed.*2d 188, *cert. denied,* 368 *U.S.* 933, 82 *S.Ct.* 370, 7 *L.Ed.*2d 195 (1961)).

A jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons. Newly discovered

evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial. See, e.g., *State v. Buonadonna*, 122 *N.J.* 22, 51, 583 *A.*2d 747 (1991) (finding "sketchy" evidence insufficient to warrant new trial). We must keep in mind that the purpose of post-conviction review in light of newly discovered evidence is to provide a safeguard in the system for those who are unjustly convicted of a crime. *See State v. Afanador*, 151 *N.J.* 41, 49, 697 *A.*2d 529 (1997) (citing *State v. McQuaid*, 147 *N.J.* 464, 482, 688 *A.*2d 584 (1997)). However difficult the process of review, the passage of time must not be a bar to assessing the validity of a verdict that is cast in doubt by evidence suggesting that a defendant may be innocent. *See State v. Cummins*, 168 *N.J.Super.* 429, 433, 403 *A.*2d 67 (Law Div.1979) (stating that "manifestly unjust conviction" of innocent person "should be set aside at any time").

■ Under prong one of the *Carter* test, we first must look to the issue of materiality as that term pertains to the defense in a criminal case. *Carter, supra,* 85 *N.J.* at 314, 426 *A.*2d 501. Material evidence is any evidence that would "have some bearing on the claims being advanced." *State v. Henries*, 306 *N.J.Super.* 512, 531, 704 *A.*2d 24 (App.Div.1997). Clearly, evidence that supports a defense, such as alibi, third-party guilt, or a general denial of guilt would be material. In this case, testimony of a witness that would support a defense claim that someone other than defendant killed the victim is material evidence because it relates "directly to the focal issue of the trial." *Ibid.; see also State v. Robinson*, 253 *N.J.Super.* 346, 362, 366, 601 *A.*2d 1162 (App.Div.) (agreeing that evidence that someone other than defendant was at scene of crime is material because it "goes to the issue of ... who committed a crime"), *certif. denied*, 130 *N.J.* 6, 611 *A.*2d 646 (1992).

Determining whether evidence is "merely cumulative, or impeaching, or contradictory," and, therefore, insufficient to justify

the grant of a new trial requires an evaluation of the probable impact such evidence would have on a jury verdict. Therefore, the focus properly turns to prong three of the *Carter* test, whether the evidence is "of the sort that would probably change the jury's verdict if a new trial were granted." *Carter, supra,* 85 *N.J.* at 314, 426 *A.2d* 501; *see also Henries, supra,* 306 *N.J.Super.* at 535, 704 *A.2d* 24. The characterization of evidence as "merely cumulative, or impeaching, or contradictory" is a judgment that such evidence is not of great significance and would probably not alter the outcome of a verdict. However, evidence that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory. *See Henries, supra,* 306 *N.J.Super.* at 535, 704 *A.2d* 24.

Two illustrations will serve to make the point. Evidence that the only prosecution witness who identified the defendant as the person committing the crime was in another state when the crime was committed is not "merely" impeaching evidence, but evidence that strikes at the heart of the case. Moreover, newly discovered photographic evidence categorically establishing that the defendant, whose alibi was rejected at trial, was at another location at the precise time of the commission of a crime would not be "merely" cumulative because such evidence would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict.

A clear example of the application of those principles is *State v. Gookins,* 135 *N.J.* 42, 637 *A.2d* 1255 (1994). In that case, the three defendants entered pleas of guilty to driving while under the influence based on breathalyzer tests conducted by a police officer. *Id.* at 45, 637 *A.2d* 1255. Subsequently, that officer pled guilty to falsifying a breathalyzer test result in an unrelated drunk-driving case. *Id.* at 44, 637 *A.2d* 1255. He also was implicated in similar instances of misconduct. *Ibid.* Based on the newly discovered evidence of falsified breathalyzer tests, this Court ordered new trials for the three defendants. *Id.* at 47–48, 637 *A.2d* 1255. We

held that the evidence would be admissible to show that the officer had engaged in a pattern of falsifications and had the opportunity to falsify the defendants' breathalyzer readings as well. *Id.* at 48, 637 *A.2d* 1255. We implicitly concluded that such evidence was not mere impeachment evidence, but had the clear capacity to alter the outcome of the case.[2]

In *State v. Henries, supra,* the Appellate Division found that newly discovered evidence—evidence that would impeach and powerfully undermine the credibility of the prosecution's principal witness—warranted a new trial in a murder case. 306 *N.J.Super.* at 535–36, 704 *A.2d* 24. In *Henries,* the defendant was convicted by a jury of murder based on the testimony of a thirteen-year-old boy who witnessed the events and whose "identification was the linchpin upon which the verdict rested." *Id.* at 524, 530, 704 *A.2d* 24. After the verdict, the defendant learned that the child suffered from multiple and severe psychiatric disorders and was taking a substantial amount of potent medication. *Id.* at 521–28, 704 *A.2d* 24. The court found that the medical records strongly suggested that the child's condition impaired his ability to perceive and recall events reliably. *Id.* at 535, 704 *A.2d* 24. The child was the State's only witness to identify the defendant and to link him to the murders. *Id.* at 530, 704 *A.2d* 24. The Appellate Division ordered a new trial, rejecting the State's trivialization of the evidence as "merely" impeachment and rejecting the trial court's finding that the evidence "related only to issues of credibility" that would not have made a difference in the outcome of the verdict. *Id.* at 529, 536, 704 *A.2d* 24. The appellate panel recognized that however the newly discovered evidence was characterized, that evidence would probably lead to an acquittal in a new trial. *Id.* at 536, 704 *A.2d* 24. Thus, a new trial was warranted. *Ibid.*

---

2 Although not germane to this case, we note for completeness that in *Gookins, supra,* because the egregious nature of the officer's pattern of misconduct placed in serious doubt the integrity of his work product, we barred the use of any evidence developed by the officer at any new trial of the three defendants. 135 *N.J.* at 51, 637 *A.2d* 1255.

On the other hand, in *State v. Coburn,* 221 *N.J.Super.* 586, 600–01, 535 *A.*2d 531 (App.Div.1987), *certif. denied,* 110 *N.J.* 300, 540 *A.*2d 1281 (1988), Justice (then Judge) Coleman, writing for the Appellate Division, found the newly discovered evidence to be cumulative, and, therefore, insufficient to meet the test for the grant of a new trial. In *Coburn,* the defendant was convicted of murdering his girlfriend in a van by shooting her twice with a .22 caliber handgun. *Id.* at 589, 592–93, 535 *A.*2d 531. The defendant claimed that the shooting was an accident that occurred when he attempted to grab the gun from his girlfriend's hand. *Id.* at 593–94, 535 *A.*2d 531. The defendant sought a new trial based on a toxicology report produced after trial that revealed that several different types of drugs were in the victim's bloodstream at the time of her death. *Id.* at 599–600, 535 *A.*2d 531. Defendant suggested that this evidence supported his theory that the victim was in a "wild" state at the time of the shooting and that the death was caused accidentally by her conduct. *Id.* at 599, 535 *A.*2d 531. The appellate panel rejected that argument finding it "highly improbable that the toxicological report would have altered the jury's verdict." *Id.* at 600, 535 *A.*2d 531. The court noted that the jury was permitted to infer that fresh needle marks on the victim's left wrist indicated the recent injection of drugs and still the jury rejected the defendant's theory of an accidental shooting. *Id.* at 600–01, 535 *A.*2d 531. The appellate panel reasoned that the defendant's claim that the weapon twice discharged accidentally was implausible because the gun could not fire unless the hammer was cocked and the trigger had to be pulled with four and one-half pounds of pressure. *Id.* at 601, 535 *A.*2d 531. Accordingly, the panel found the new evidence supporting the defendant's claim would not have altered the jury's verdict and did not warrant a new trial. *Id.* at 600, 535 *A.*2d 531.

The common theme in those cases is that the reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury. The power of the newly discovered evidence to alter the verdict is the central issue, not the label to be

placed on that evidence. See *Henries, supra*, 306 *N.J.Super.* at 529–30, 704 *A.2d* 24 (noting that designation of evidence as "merely cumulative or impeaching" is "sometimes, perhaps too casually, asserted").

▇ Prong two of the *Carter* test recognizes that judgments must be accorded a degree of finality and, therefore, requires that the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence. *Carter, supra*, 85 *N.J.* at 314, 426 *A.2d* 501. A defendant is not entitled to benefit from a strategic decision to withhold evidence. *See, e.g., State v. Drisco*, 355 *N.J.Super.* 283, 290–91, 810 *A.2d* 81 (App.Div.2002) (holding that defense attorney's strategic decision to withhold alibi defense did not constitute ineffective assistance of counsel), *certif. denied*, 178 *N.J.* 252, 837 *A.2d* 1094 (2003). This prong also should encourage defendants and attorneys to act with reasonable dispatch in searching for evidence before the start of the trial. Surely, there is no advantage to a defendant when his attorney fails to discover or overlooks exculpatory evidence. It is worth mentioning, however, that evidence clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time of trial would almost certainly point to ineffective assistance of counsel in violation of the Federal and State Constitutions. *See, e.g., State v. Russo*, 333 *N.J.Super.* 119, 137, 140, 754 *A.2d* 623 (App.Div.2000). We would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a less than reasonably diligent attorney. *See Strickland v. Washington*, 466 *U.S.* 668, 694, 104 *S.Ct.* 2052, 2068, 80 *L.Ed.2d* 674, 698 (1984) (stating that grant of new trial because of ineffective assistance of counsel depends on whether result would have been different but for counsel's deficiency); *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.2d* 336 (1987) (same). However, the belated introduction of evidence may be relevant to the PCR court's evaluation of the evidence's credibility. *See, e.g., Buonadonna, supra*, 122 *N.J.* at 50, 583 *A.2d*

747 (finding that late discovery of evidence rendered it "highly suspect").

## IV.

We now apply the principles of *Carter* to the facts of this case. The Ways trial was a tale of two street corners in Camden, with the State and defendant presenting different accounts of the location of the murder and the identity of the murderer. The State claimed that Ways fired the fatal shot into the green Datsun across from the Time and Place Lounge at Chase and Louis Streets. Ways claimed that Franklin King was the shooter and that the shooting occurred across from Wally's Bar on the corner of Thurman and Louis Streets.

The State presented as its central witness Wayne Hunter, who, after consuming cocaine, marijuana, and alcohol, arrived at Chase and Louis Streets, in search of yet more drugs. The near-sighted and possibly inebriated Hunter, who was not wearing his prescription glasses, made observations under great stress over the course of seconds at the time of the shooting. Hunter's physical description of the shooter did not exactly match Anthony Ways. Hunter estimated that the shooter was 6' and 150 pounds, a considerable difference from Ways who stood 6'2" and weighed 225 pounds. He did describe, however, a sweatshirt worn by the shooter that was similar to the one worn by Ways at the time of his arrest several days after the shooting. The sweatshirt taken from Ways was identified by Hunter as the one he observed on the shooter. But there were no powder burns or blood on that sweatshirt or any other physical link tying Ways to the murder. Last, Ways's picture was selected by Hunter from a photographic array that the Appellate Division noted was suggestive because Ways was the only individual wearing a hat.

The prosecution's second eyewitness, Donna Carter, admitted that she was under the influence of cocaine at the time of the shooting and gave multiple conflicting accounts. In her original statement, she claimed that Mancakes (Anthony Ways) and Bra-

heem (Bryant Anderson) were at the side of the Datsun when the gun discharged. However, she described the shooter as 5'6" or 5'7" (the approximate height of Franklin King), whereas Ways stood at 6'2". She also failed to select Ways's picture from the same photographic array shown to Hunter. Moreover, the jury acquitted Anderson of any participation in the shooting, seemingly rejecting at least part of Carter's account. The area where Franklin Shaw contended that the shooting happened was not unknown to Carter; she admitted to speaking with Shaw there the day of the shooting. At the PCR hearing, Carter recanted her initial statement, which she contended was the product of police manipulation, and emphatically denied that Ways was the shooter.

The jury rejected the alibi and third-party guilt defenses presented by Ways. Ways posited at the PCR hearing that the newly discovered evidence raised the probability of a miscarriage of justice because that evidence pointed to Franklin King as the killer. At trial, Franklin Shaw, a self-admitted drug user and convicted drug dealer, testified that King and Ben Johnson approached the victim's vehicle across from Wally's Bar on the corner of Louis and Thurman Streets, and that King, armed with a .44 caliber handgun, fired the fatal shot. Shaw later reported what he observed to the police. There was corroboration of Shaw's account from a patron and the bartender at Wally's Bar who heard Shaw describe the shooting as he entered the bar. In line with Hunter's description, there was an alleyway between Wally's Bar and an adjacent building, whereas there was none by the Time and Place Lounge. (On the other hand, that establishment was missing the cyclone fence described by Hunter.)

King admitted at trial that the day before the shooting he acquired a .44 caliber handgun, which he then hid. According to King, the gun mysteriously disappeared one day after the shooting. It is undisputed that the murder weapon was a .44 caliber handgun.

There were substantial questions raised concerning the credibility and reliability of the witnesses for both the State and the

defense at trial. The jury by its verdict answered those questions in favor of the State. We cannot ignore, however, that the State's proofs were far from overwhelming.

Against that backdrop, the PCR court made findings that some evidence presented by Ways at the PCR hearing was merely cumulative or impeaching, some lacked credibility, and some, even if credible, was incapable of changing the outcome of the trial. We cannot conclude, as did the PCR court and the Appellate Division, that none of the newly discovered evidence would have had the probable effect of altering the verdict. We believe that certain pieces of the newly discovered evidence, when placed in context with the trial evidence, sufficiently implicates King in the killing. That third-party guilt evidence presented at the PCR hearing " 'has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.' " *State v. Fortin,* 178 *N.J.* 540, 591, 843 *A.2d* 974 (2004) (quoting *State v. Sturdivant,* 31 *N.J.* 165, 179, 155 *A.2d* 771 (1959), *cert. denied,* 362 *U.S.* 956, 80 *S.Ct.* 873, 4 *L.Ed.2d* 873 (1960)). The new evidence, however labeled—impeaching, contradictory, or corroborative—in our view, would probably change the outcome of the case.

Tyrone Williams, who the PCR court found credible, testified that between 2:00 a.m. and 3:00 a.m. on April 23, several hours after the killing of Weist, King arrived at his door anxious to sell a .44 caliber handgun. There was one spent shell in the chamber of the gun and King admitted to Williams that he had shot someone that evening. Williams did not buy the gun. We defer to the court's finding that Williams was a newly discovered witness.

In King's PCR testimony he admitted attempting to sell, apparently without success, a .44 caliber handgun, which came into his possession on April 22 and which was missing from its hiding place on April 24. King also conceded that he told at least one other person that he killed John Weist. That testimony coincided with the PCR testimony of Thomas Ways, who stated that King had admitted to him his role in the murder. Disregarding King's corroboration, the PCR court found Thomas Ways not credible

solely on account of his familial relationship with Anthony Ways. Although King maintained in his testimony that he was not the shooter, he stated that he knew the shooter's identity and that it was not Anthony Ways. The PCR court inexplicably never followed-up and asked King for the name of the killer. Needless to say, one could hardly have expected King, who already was serving time in prison and awaiting prosecution for several violent crimes, to incriminate himself in the murder or to have earlier in the investigation led the police to the murder weapon.

The PCR court found credible Officer Hall's testimony that when Franklin King was brought to his house by a street gang, King stated, "I'm not the only one in Camden with a .44 Magnum." The import of Hall's testimony is that King admitted his possession of a .44 Magnum before it was common knowledge what kind of weapon had been used in the Weist killing. The PCR court discounted that point because King testified at the hearing that someone from the Hilltop Posse told him that a .44 Magnum was the murder weapon. We find it somewhat curious that the PCR court found King incredible in all respects but this one. Nevertheless, we do not find Hall's testimony a persuasive reason for granting a new trial. Moreover, Hall's identity was well known to the defense at trial and King's statement to Hall, which was only barely suggestive of consciousness of guilt, could have been discovered with reasonable diligence.

We defer to the court's adverse credibility findings with regard to Vincent Williams, who claimed to have witnessed King commit the shooting; Donna Carter, who recanted her initial police statement identifying Ways as the shooter; and Todd Johnson, who recanted his trial testimony that Ways was at the Time and Place Lounge around the time of the shooting. We defer to a PCR judge's credibility findings because that judge has the ability to evaluate the witnesses firsthand. *State v. Carter*, 69 *N.J.* 420, 427, 354 *A.2d* 627 (1976). That deference is particularly warranted in the context of recantation testimony, a species of newly discovered

evidence generally regarded "as suspect and untrustworthy." *Ibid.*

Nevertheless, what remains of the newly discovered evidence is strongly corroborative of the account of Franklin Shaw, whose credibility had been hobbled because he was a convicted drug dealer and addict. From that newly discovered evidence, a jury could infer that King attempted to dispose of the murder weapon to Tyrone Williams, that King confessed to the shooting, and that the gun and one spent shell in the .44 Magnum were the physical links to the crime. The jury also could infer that the disappearance of the gun a day after the shooting was not serendipitous, but a purposeful act to conceal evidence of a crime. Additionally, there is nothing in the record to suggest that another person had been the victim of a single shot from a .44 caliber handgun that evening in the same area of Camden. In this context, King's declaration against interest that he killed John Weist—a statement made to Thomas Ways or some other unknown individual—cannot be dismissed so easily as false braggadocio. The PCR court found Tyrone Williams credible, and if a jury were to as well, the account by Franklin Shaw would be strongly corroborated and difficult to reject.

We do not decide where the truth ultimately lies, because that function falls within the exclusive purview of the jury after reviewing all the evidence. But we do hold that the newly discovered evidence presented at the PCR hearing creates a probability that a jury would return a verdict different from the one reached at the first trial.

Much time has passed since the crime and the trial, and we are mindful of the difficulties of a retrial at this late date. But the passage of time is an insufficient reason not to correct an injustice. We conclude that there is a probability—not a certainty—that a new jury would find Anthony Ways not guilty of the crime for which he is imprisoned, and, therefore, we grant a new trial. A jury now must determine, based on all the evidence, new and old,

whether Anthony Ways is guilty of murder beyond a reasonable doubt.

## V.

Ways also claims that he received ineffective assistance of counsel in violation of our Federal and State Constitutions because of his trial counsel's failure to request a fact-specific, cross-racial identification charge. We need not address that issue in light of our disposition of this case, but we do offer guidance with regard to the giving of a cross-racial identification charge in a new trial.

██ Wayne Hunter, a white male, at night without his prescription glasses or optimum illumination and under tense and frightful circumstances, observed a black gunman shoot his friend. Whether Hunter's identification of Ways was reliable either independently or in context with the other trial evidence is an issue that must be decided by a jury. We believe that the jury would benefit from the cross-racial identification charge suggested in *State v. Cromedy*, 158 *N.J.* 112, 132, 727 *A.*2d 457 (1999).

In *Cromedy*, this Court recognized the " 'commonsense view that members of one race have greater difficulty in accurately identifying members of a different race.' " *Id.* at 133, 727 *A.*2d 457 (quoting *United States v. Telfaire*, 469 *F.*2d 552, 559 (D.C.Cir. 1972)). We held that when "identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability," the trial court should give a cross-racial identification jury instruction. *Id.* at 132, 727 *A.*2d 457. The purpose of that instruction is to caution the jury to "pay close attention" to the real possibility that race may influence the accuracy of the identification. *Id.* at 133, 727 *A.*2d 457.

Hunter's identification of Ways unquestionably was critical to the outcome of the case. The corroborating evidence, in large measure, came from recanting witnesses, Donna Carter and Todd Johnson, and others whose credibility and reliability were strongly

challenged. Given that background, we conclude that a jury will be better informed and able to fulfill its fact-finding role if it receives a *Cromedy* instruction.

## VI.

We, therefore, reverse the Appellate Division, vacate the judgment of conviction, and order a new trial consistent with this opinion.

*For reversal*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.