**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0031-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CALVIN L. ALEXANDER,

    Defendant-Appellant.

_____

Argued June 9, 2022 – Decided June 24, 2022

Before Judges Mawla and Alvarez.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 93-06-2223.

Jane Pucher (The Innocence Project) of the New York bar, admitted pro hac vice, argued the cause for appellant (The Innocence Project, attorneys; Jane Pucher and Vanessa Potkin, on the briefs).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the brief).

PER CURIAM

Defendant Calvin L. Alexander appeals from a July 20, 2021 order denying his motion for post-conviction discovery relating to his 1994 conviction for murdering Yvette Bennett in her apartment. We affirm.

We discussed some of the salient facts in State v. Alexander (Alexander I), No. A-4207-93 (App. Div. Mar. 8, 1996) (slip op. 1-4). At defendant's trial, the State called several fact and expert witnesses, and presented evidence of the injuries Bennett suffered, including a bite mark on her shoulder blade, and "[a]n autopsy [that] disclosed the major cause of death was manual strangulation with a secondary cause attributed to [a] stab wound [in her chest] and blunt force trauma to her head." Id. at 2. There were no signs of forced entry to the apartment. Ibid.

Police interviewed the building superintendent Kelly Williams and his live-in girlfriend Lachelle Griffin and learned defendant had been staying with them for several months. Ibid. Pursuant to a tip, police recovered a red sweatsuit worn by defendant the night of the murder, which contained blood stains, from Williams' apartment. Id. at 3.

A-0031-21

Police took defendant into custody, <u>Mirandized</u>[1] him, and questioned him about the murder. <u>Ibid.</u> They also took a dental impression from defendant, and after they confronted him with the fact the impression was "'a perfect match' with the bite mark on Bennett's back, defendant confessed to the events surrounding the murder." <u>Ibid.</u> He told police: Bennett let him into the apartment; he was wearing a sweatshirt and sweatpants (both red); and after an argument about Bennett's male friends, he "grabbed her around the throat[,] . . . lifted her off the ground[, and] dropped her on the bedroom floor." <u>Ibid.</u>

Griffin told police that defendant told her he wanted to "get with [Bennett]" and on the day of the murder he was at her apartment until approximately 7:00 p.m. when he left, telling Griffin he was going to Newark to get some money. <u>Id.</u> at 4. However, when defendant returned later that evening, Griffin saw him "coming from an area near the victim's apartment, not from the direction of Newark[.]" <u>Ibid.</u>

Griffin testified that the day after the murder, after police arrived at the building, defendant called "to see if anybody had called for him . . . ." She told defendant Bennett was killed and later in the day defendant called once more asking whether police were still in the building. He also asked Griffin not to

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3

mention his name to police because he was on parole. Over the next few days, defendant called multiple times asking whether police were still in the area and if they knew about him. Sergeant Frank Cocchi of the East Orange Police Department also testified on behalf of the State, and stated he was present on an occasion when defendant called and asked Williams "if the cops were asking about the murder . . . ." When Cocchi found and arrested defendant, defendant gave him a false name.

Dr. Ira Titunik, a diplomate of the American Board of Forensic Odontology (ABFO), testified on behalf of the State as an expert in forensic odontology. He opined the scientific dental community "accepted . . . that each and every person has a very unique and specific configuration of teeth." He was present at the autopsy and concluded the bite mark on Bennett's back was human due to its size and shape and was made "at or about the time of death." Titunik took several dental impressions of defendant and visually compared them to the life-sized photographs taken of the bite mark. He concluded defendant's teeth matched the bite mark, which could not have been made by any person other than defendant.

The defense moved for acquittal, arguing "[t]he only proof . . . of anything is that there was contact between [defendant and Bennett] through this bite

A-0031-21

mark."  The trial judge disagreed, reasoning there was other evidence beyond

Titunik's testimony linking defendant to the murder, including testimony

Bennett was accompanied

> after she returned home from work in the evening . . . .
>
> Then there was [a] conversation on the telephone testified to, which would seem to put [Bennett] in her apartment sometime in the early evening of the 13th. There is testimony to the effect that the death was approximately a day and a half . . . from the time that the temperature was taken at the time she was pronounced dead.
>
> Thus, it would seem that there is evidence from which the jury could infer that the defendant was with her at or around the time that she met her death, and the jury could infer that the bite, given the position of it and everything else, could have been inflicted simultaneously with or during the same incident as the beating and stabbing and the strangulation.

The defense called Williams, who testified the red sweatsuit belonged to

defendant.  He also asserted defendant had access to the building's apartment

keys, including Bennett's floor, and on one occasion Williams was angry with

defendant for taking the keys without permission.

Defendant was convicted and sentenced.  We affirmed.  Id. at 1-2.

Defendant filed a petition for post-conviction relief (PCR), alleging trial

counsel was ineffective for not retaining a dental expert to refute Titunik's

5

testimony evidencing the marks on Bennett's back perfectly matched the impression of defendant's teeth.  State v. Alexander (Alexander II), No. A-1665-97 (App. Div. Feb. 4, 1999) (slip op. at 2).  Defendant's petition was denied.  We affirmed concluding the petition did not assert "that any other expert would have disputed [Titunik's] opinion."  Ibid.  "There was more than ample evidence to support the jury's finding of guilt beyond a reasonable doubt, including [defendant's] own statement to the police and the blood[-]stained clothing found in his apartment."  Id. at 3.

In 2015, defendant moved for DNA testing of "a swab taken of a bite mark on the victim's body, sexual assault specimens, fingernail evidence, and the victim's undergarments[.]"  He contended "Titunik's testimony that [defendant's] dentition matched the bite mark found on the [victim] was the sole piece of physical evidence connecting [him] to the murder."

On August 18, 2017, the court entered a consent order granting the motion for DNA testing.  Bennett's undergarments revealed a mixture of at least two male contributors and excluded defendant as a major contributor, but the analysis reach no conclusion on the minor profile.

In March 2020, defense counsel sought access to photographs, dental impressions, and other related evidence, which the prosecutor denied.  In

January 2021, defendant filed a motion for post-conviction discovery to compel the production of the bite mark evidence introduced at his trial. He again alleged the "dentition and a mark recovered from the victim's shoulder was the only physical evidence tying" him to the crime. He asserted scientific advances since trial showed the scientific community rejected bite mark evidence "as a reliable means of identifying perpetrators of violent crimes" and discovery was necessary to prove his innocence.

Defendant attached a certification from Dr. Adam J. Freeman, an ABFO member. Freeman certified that due to changes in the field of bite mark analysis, "Titunik's testimony is no longer sanctioned by his own board-certifying entity, nor accepted as valid by the broader scientific community." He added, "Titunik's conclusion about the source of the alleged teeth marks in this case is now understood to lack any basis in science, and indeed is wrong, both as a matter of generally accepted science and pursuant to the ABFO standards and guidelines." He concluded Titunik's testimony and individualized conclusions could not be presented to a jury today. Defendant also submitted a certification from Dr. Cynthia Brzozowski, an ABFO-certified forensic dentist, concurring with Freeman's opinion.

A-0031-21

Following oral argument, the motion judge issued a written decision denying the motion. The judge concluded the bite mark evidence qualified as "newly discovered" under the second prong of the test articulated in State v. Carter, 91 N.J. 86 (1982) because the scientific studies challenging such evidence were not available at the time of defendant's trial. The judge also concluded the bite mark evidence satisfied the first Carter prong because it "is material to [defendant's] identity as the murderer."

However, quoting State v. Nash, the judge noted the "'central issue' is whether the newly discovered evidence has the power to 'shake the very foundation of the State's case and almost certainly alter the earlier jury verdict.'" 212 N.J. 518, 549 (2013). The judge found it did not. He noted if Titunik were testifying today, the only change would be that he would not be able to exclude defendant as the individual who made the bite mark. Even if Titunik could exclude defendant, it would merely result in contradictory evidence presented at trial, "result[ing] in a 'battle of the experts,' leaving a jury to determine what weight, if any, to give the testimony of one expert or another."

The judge also concluded there was substantial evidence of defendant's guilt: his clothing and inculpatory statement to police. Therefore, "even the most favorable re-examination . . . would result in evidence that is 'merely

8

contradictory' and would not have the capacity to 'almost certainly' alter the jury's verdict."

On September 15, 2021, the judge issued a letter amplifying his findings to clarify the standard he applied to defendant's motion. He acknowledged he quoted from State v. Ways, 180 N.J. 171 (2004), a case articulating the standard used on a motion for a new trial. However, he did so "to convey the nature and import of the type of evidence that would probably change the outcome, not to impose a greater burden. Ultimately, [he] disagreed with [defendant's] view of the importance of the [bite mark] evidence and its capacity to change the outcome of his trial . . . ."

Defendant raises the following points on appeal:

> POINT I — IN DENYING THE DISCOVERY REQUEST, THE TRIAL COURT ERRED IN CITING AN INCORRECT, HIGHER STANDARD [DEFENDANT] WOULD HAVE TO MEET TO BE GRANTED A NEW TRIAL.

> POINT II — THIS NEW EVIDENCE IS MATERIAL AND, IF HEARD BY THE JURY, WOULD PROBABLY RESULT IN A DIFFERENT OUTCOME AT TRIAL.

I.

Post-conviction discovery requests are "not granted automatically." State v. Szemple, 247 N.J. 82, 97 (2021). Rather, an "analysis of any motion . . . must

. . . necessarily consider the proposed use to which the discovery would be put[.]" Id. at 103. "[T]he State is not required post-conviction to allow defendants to '"fish" through official files for belated grounds of attack on the judgment, or to confirm mere speculation or hope that a basis for collateral relief may exist.'" Id. at 107 (quoting State v. Marshall, 148 N.J. 89, 270 (1997)). "If it is impossible for [the] defendant to prevail on his ultimate claim for relief – even should the requested discovery prove favorable to his cause – then there is no need to separately analyze the discovery request[.]" Id. at 104.

In Szemple, the defendant sought discovery in anticipation of a motion for a new trial. Id. at 97. The Court held the defendant had to satisfy the three-prong Carter test, positing that

> a new trial is warranted only if the evidence is[:] "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."
>
> [Id. at 99 (quoting Nash, 212 N.J. at 549).]

A trial court has discretion to grant post-conviction discovery "when justice so requires." Id. at 97 (quoting Marshall, 148 N.J. at 269). "[I]n recognition of the importance of finality," this discretion is seldom exercised. Ibid.

A-0031-21

We review a motion judge's decision on a discovery issue for abuse of discretion. Id. at 94. As a result, we do not disturb the judge's ruling unless it is "so wide of the mark" or "based on a mistaken understanding of the applicable law." Ibid. (quoting State ex rel. A.B., 219 N.J. 542, 554 (2014)). The trial court's legal conclusions are reviewed de novo. Nash, 212 N.J. at 540-41.

Pursuant to these principles, we reject defendant's contention that the motion judge imposed a higher burden by applying the standard for a new trial to the discovery motion. The judge thoroughly reviewed Titunik's testimony and the evidence presented at trial and correctly concluded the bite mark evidence was not dispositive. Newly discovered evidence must have the power to alter the jury's verdict. Nash, 212 N.J. at 549-50. Even if we accepted defendant's arguments regarding the impropriety of the science undergirding bite mark evidence, the discovery sought would not vanquish the State's case. As we explain below, Titunik would still testify, and the jury would hear competing theories about bite mark evidence rendering the discovery defendant now seeks "merely contradictory," an inadequate ground for granting his motion. The judge properly denied the motion and did not abuse his discretion.

A-0031-21

II.

We reject defendant's assertions the science questioning bite mark evidence renders such evidence inadmissible, and the State would be unable to convict him. In State v. Fortin, we considered the scientific validity of bite mark identification and upheld the denial of a defendant's motion for a new trial where the State presented expert testimony about bite marks. 464 N.J. Super. 193, 223 (App. Div. 2020). There, as was the case here, the expert stated "[bite mark] comparison theory is based on the idea that every individual has a unique set of teeth." Id. at 207. The defense presented its own expert, who disputed the State's claims that the marks were in fact teeth marks and testified bite mark evidence was not a "true science" and led to wrongful convictions. Id. at 208.

We acknowledged there were numerous published scientific articles questioning the reliability of bite mark analysis since the defendant's trial, but this did not constitute newly discovered evidence under the second Carter prong because similar evidence was produced at trial. Id. at 219-20. Nonetheless, the evidence was material under the first Carter prong because it was a central issue in the State's case at trial. Id. at 221. However, we held the evidence would probably not alter the outcome of the trial under the third Carter prong because at a new trial an expert would likely testify that the defendant would not be

12

excluded from making the bite marks. Id. at 221-22. Moreover, notwithstanding the new scholarship questioning the viability of bite mark evidence, we held such evidence is still admissible in New Jersey. Id. at 223. We noted "there was other strong evidence" of the defendant's guilt aside from the bite mark evidence. Id. at 222.

Here, there is no question the science disputing bite mark evidence was not available at the time of defendant's trial. Indeed, five years after his trial, our Supreme Court held bite mark "analysis has gained general acceptance and therefore is reliable." State v. Timmendequas, 161 N.J. 515, 624 (1999). However, the first and third Carter prongs, are "inextricably intertwined" and require the court to determine "[t]he power of the newly discovered evidence to alter the verdict . . . ." Nash, 212 N.J. at 449-50 (quoting Ways, 180 N.J. at 191-92). Although defendant would be able to present contradictory testimony and perhaps impeach Titunik, we are unconvinced it would change the outcome of the case given the gamut of other evidence implicating defendant, including Griffin's and Williams' testimony, defendant's conduct and inculpatory statement, and the physical evidence adduced at trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION

A-0031-21