# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0014-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.C.H.,

     Defendant-Appellant.

_____

Argued September 18, 2023 – Decided January 28, 2025

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 17-11-0495.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Taylor L. Napolitano, Assistant Deputy Public Defender, of counsel and on the brief).

Matthew M. Bingham, Assistant Prosecutor, argued the cause for respondent (Kristin J. Telsey, Salem County Prosecutor, attorney; David M. Galemba, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

GRETA GOODEN BROWN, J.A.D.

Following a March 2020 jury trial, defendant was convicted of three counts of first-degree aggravated sexual assault of his daughter, "Hannah,"[1] over a period of approximately eleven years. The assaults consisted of defendant digitally penetrating the victim while bathing her when she was four years old; forcing the victim to perform oral sex on him when she was eight years old; and forcibly raping her on her fifteenth birthday. In 2017, about a year after the last incident, the victim disclosed the assaults to school authorities. At trial, the evidence consisted almost entirely of testimony from the victim, who recounted the assaults; defendant, who denied the allegations; and defendant's wife, "Lisa," who sided with defendant. Lisa is also the victim's mother. In rendering the guilty verdict, the jury credited the victim's version of events and rejected defendant's account.

On appeal, defendant raises the following arguments for our consideration:

---

[1] We use initials or pseudonyms to maintain the confidentiality of sealed records under Rule 1:38-11 and to protect the privacy of the victim of sexual violence pursuant to Rule 1:38-3(c)(12).

POINT I

BECAUSE HANNAH'S TESTIMONY WAS VAGUE ON COUNTS TWO AND THREE AND NOT CREDIBLE AS TO ANY COUNT, THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

POINT II

[DEFENDANT] IS ENTITLED TO A NEW TRIAL BECAUSE COUNSEL WAS INEFFECTIVE FOR FAILING TO CROSS-EXAMINE HANNAH ON HER CONTRADICTORY STATEMENTS TO POLICE, INCLUDING HER FALSE ALLEGATIONS AGAINST FAMILY FRIEND [J.R.]. IN ADDITION, [DEFENDANT] IS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF YET MORE CONTRADICTORY ALLEGATIONS BEARING NEGATIVELY ON HANNAH'S CREDIBILITY.

A. [DEFENDANT] IS ENTITLED TO A NEW TRIAL BECAUSE HE WAS PREJUDICED BY TRIAL COUNSEL['S] . . . DEFICIENT PERFORMANCE.

B. [DEFENDANT] IS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE BEARING ON [HANNAH'S] CREDIBILITY.

POINT III

[DEFENDANT] WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S BLATANT BURDEN-SHIFTING IN QUESTIONING LISA ABOUT THE ACME RECEIPT.

3

POINT IV

HANNAH'S SCANT ALLEGATIONS OF ABUSE AT FOUR AND EIGHT YEARS OLD (COUNTS TWO AND THREE) SHOULD HAVE BEEN SEVERED FROM HER ALLEGATIONS OF ABUSE AT AGE FIFTEEN (COUNT ONE) BECAUSE THEY WERE NOT RELEVANT TO ANY MATERIAL ISSUE, SIMILAR IN KIND, CLOSE IN TIME, OR BASED ON CLEAR AND CONVINCING EVIDENCE, AND PREJUDICED [DEFENDANT] BECAUSE NO JURY WOULD HAVE FOUND HIM GUILTY ON SUCH FLIMSY ALLEGATIONS ALONE. (NOT RAISED BELOW).

POINT V

[DEFENDANT] IS ENTITLED TO RESENTENCING GIVEN THAT THE COURT RELIED ON IMPROPER VICTIM IMPACT STATEMENTS AND THE AGGRAVATING FACTORS RELATED SOLELY TO THE OFFENDER AND NOT THE OFFENSE.

Based on our review of the record and the applicable legal principles, we reject defendant's contentions and affirm.

I.

We glean these facts from the trial record. Hannah and her family lived in various homes throughout her childhood. From 2005 to 2006, when Hannah was around four years old, the family lived on Poplar Street in Penns Grove. At trial, Hannah was able to accurately describe the layout of the house. Hannah alleged that

4

during this period of her life, defendant would digitally penetrate her while giving her a bath.

Between 2009 and 2010, when Hannah was eight years old, the family moved into a house on Oliver Avenue in Pennsville, where they lived with Hannah's maternal grandparents. Hannah and her parents lived in the basement of the Pennsville home, which again, she was able to describe in detail at trial. While living in the house, defendant began forcing Hannah to perform oral sex on him "normally after school." Although defendant had fewer opportunities to sexually abuse Hannah during this period of time due to the near-constant presence of Hannah's grandfather, the abuse still continued throughout the year the family lived in the Pennsville house.

The family later moved into a trailer in Carney's Point. When Hannah was thirteen years old, she moved out of the trailer and began living with her paternal grandparents. Hannah continued to visit her parents at the trailer on a weekly basis, during which time Lisa would leave Hannah alone with defendant.[2] Also, around

---

[2] Hannah's parents had her move out of the trailer because defendant had been arrested and charged with sexually assaulting Hannah's cousin. He was convicted of endangering the welfare of a child, subject to Megan's Law, and not allowed to live with minors or be left alone with them. When defendant testified at trial, the fact that he had been previously convicted of a third-degree crime in 2014 was the only information presented to the jury. No other information regarding the nature and consequences of the prior conviction was revealed to the jury.

A-0014-21

Hannah's thirteenth birthday, she began treatment at A.I. duPont Hospital for Children on a regular basis for recurring migraines.

The last instance of sexual assault occurred on Hannah's fifteenth birthday, September 24, 2016. After spending time with her mother doing errands, Hannah was dropped off at the trailer to spend time with her father before attending a party at her friend's house. According to Hannah, Lisa went to ACME for groceries after dropping Hannah off at the trailer. About twenty minutes after Lisa left, defendant called Hannah into her old bedroom, removed her clothes, pushed her to the ground, tied her hands together with a cloth, and raped her. Hannah did not resist. After he ejaculated, defendant told Hannah to get dressed because "[her] mom would be home soon," and Hannah complied. When Lisa returned with the groceries, Hannah acted normal, defendant prepared dinner, and the family ate. Later that evening, her parents dropped her off at the party.

A few months after the assault occurred, Hannah was diagnosed with Von Willebrand Disease, a condition that causes a person to bruise easily. Hannah could not recall whether she sustained any bruising following the assault, but noted that although she bruised easily, she did not bruise right away.

Around June 7, 2017, Hannah disclosed the sexual assault to school authorities after one of her teachers noticed bruising on Hannah's neck. The bruising

A-0014-21

was caused by Lisa attempting to strangle Hannah after Hannah told her mother she did not want to spend time with defendant. After she disclosed the assault to school authorities, law enforcement was contacted. Carneys Point Police Detective Dale VanNamee responded to the school and took two recorded statements from Hannah; the first statement was taken the day of the disclosure, and the second was taken a week later.

Hannah was cross-examined extensively about the fact that she had never made a prior disclosure despite having "multiple opportunities," including at her regular doctor visits at A.I. duPont Hospital, at her paternal grandparents' home where she moved at age thirteen, or at the party she attended shortly after the assault. She was also questioned about the fact that she had spoken with state officials who were investigating defendant on an unrelated matter and had failed to make a disclosure then. Hannah explained that, initially, she was too young to realize defendant was doing anything wrong. Later, Hannah had only attempted to tell someone about the assault one other time. In either March 2016 or March 2017, Hannah sent Lisa an email that simply stated, "Dad hurt me." Lisa did not seek clarification from Hannah on what she meant by the email.

After Hannah disclosed the assault to school authorities, Lisa stopped communicating with Hannah, ignoring all of Hannah's attempts to speak with her

A-0014-21

mother. Hannah acknowledged consulting her mother for help remembering the exact years that the family lived at each home throughout Hannah's childhood. She explained that she needed the information for a journal she started writing around March of 2017. Hannah also explained that she withheld the information about defendant's sexual abuse because she did not want to jeopardize the close relationship she had had with her mother. However, her fears came to fruition following the disclosure.

Defendant was charged in a Salem County indictment with three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a), and N.J.S.A. 2C:14-2(a)(1). At trial, Lisa testified that she did not believe Hannah's allegations and hoped that her own testimony would help her husband. Defendant also testified and adamantly denied all the allegations. The couple testified that defendant worked as a window "caulker and re-planer" and "was never home" due to work. They further testified that defendant could not have digitally penetrated Hannah when she was a toddler because he never bathed her. They also alleged he was never alone at home with Hannah during the entire time the family lived in Penns Grove or with Hannah's grandparents, despite defendant getting time off from work on weekends and when it rained. Additionally, in their respective accounts, both Lisa and

defendant denied that Hannah was ever alone with defendant in the trailer on September 24, 2016. Instead, Lisa claimed that Hannah went to the ACME with her.

On March 13, 2020, the jury found defendant guilty of all three counts. After denying defendant's motion for a new trial, see R. 3:20-1,[3] the trial judge sentenced defendant to an aggregate term of fifteen years in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4. The judge also ordered defendant to comply with the reporting requirements and restrictions of Megan's Law, N.J.S.A. 2C:7-1 to -23. A memorializing judgment of conviction was entered on July 7, 2021, and this appeal followed.

## II.

In Point I, defendant argues the judge erred in denying his Rule 3:20-1 motion for a new trial based on insufficient evidence. Defendant asserts "[b]ecause there was no physical evidence," the case "was a pitched credibility battle between Hannah and her parents," and the entire case "rested on Hannah's testimony," which was "vague, contradictory, and not credible."

---

[3] The judge also denied defendant's motion for a judgment of acquittal, see R. 3:18-1, at the close of the State's case. The motion was renewed at the conclusion of the defense's case and again denied.

Rule 3:20-1 provides, in pertinent part:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice. . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

Our standard of review of a Rule 3:20-1 motion is well settled:

> In examining a trial court's denial of a motion for a new trial based on insufficiency of the evidence, an appellate court may not reverse that ruling "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. "The evidence should be sifted to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." State v. Carter, 91 N.J. 86, 96 (1982) (citing Jackson v. Concord Co., 54 N.J. 113 (1969)).
>
> . . . However, a reviewing court should not overturn the findings of a jury merely because the court might have found otherwise if faced with the same evidence. State v. Hodgson, 44 N.J. 151, 162-63 (1965), cert. denied, 384 U.S. 1021 (1966). Faith in the ability of a jury to examine evidence critically and to apply the law impartially serves as a cornerstone of our system of criminal justice. Unless no reasonable jury could have reached such a verdict, a reviewing court must respect a jury's determination.
>
> [State v. Afanador, 134 N.J. 162, 178 (1993).]

Thus, we review the denial of a <u>Rule</u> 3:20-1 motion for a new trial based on insufficient evidence "under an extraordinarily lenient standard of review." <u>State v. Jackson</u>, 211 N.J. 394, 414 (2012). "Where the jury's verdict was grounded on its assessment of witness credibility, a reviewing court may not intercede, absent clear evidence on the face of the record that the jury was mistaken or prejudiced." <u>State v. Smith</u>, 262 N.J. Super. 487, 512 (App. Div. 1993). Indeed, "[i]n the absence of independent witnesses, the case often turns on an assessment of the credibility of the participants, an assessment better left to the trier of fact." <u>State v. Budis</u>, 125 N.J. 519, 528 (1991). As such, "a motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." <u>State v. Russo</u>, 333 N.J. Super. 119, 137 (App. Div. 2000).

Applying these principles, we conclude the verdict is sustainable. To find defendant guilty of count one predicated on the sexual assault committed when Hannah was fifteen years old, the jury had to find beyond a reasonable doubt that: (1) he committed an act of sexual penetration with Hannah while she was at least thirteen years old but less than sixteen years old, and (2) she and defendant were related by blood. N.J.S.A. 2C:14-2(a)(2)(a). For counts two

11

and three involving the sexual assaults when Hannah was ages eight and four, respectively, the jury had to find beyond a reasonable doubt that defendant committed an act of sexual penetration with Hannah when she was less than thirteen years old. N.J.S.A. 2C:14-2(a)(1). The statutory definition of "sexual penetration" includes vaginal intercourse, fellatio, and digital penetration. N.J.S.A. 2C:14-1(c).

In denying the motion, the judge determined that a reasonable jury could have found beyond a reasonable doubt that defendant sexually assaulted Hannah, provided the jury believed Hannah's testimony. The judge acknowledged that Hannah's testimony "was far less detailed" as to counts two and three, but found that when considered in the context of Hannah's "overall testimony," a rational jury could find Hannah's version of events to be credible. The judge pointed out that "the jury also had the opportunity" to hear from Hannah's parents and judge their credibility as well. The judge explained that "the jury accepted [Hannah's] testimony as the more credible version of what occurred," and "[t]here [was] no basis for th[e c]ourt to conclude that the verdicts were based on mistake, partiality, prejudice or passion." We agree with the judge's ruling and discern no basis to intervene.

On appeal, defendant reprises his various arguments challenging Hannah's credibility, all of which were considered and rejected by the judge. Specifically,

12

defendant reiterates that Hannah's allegations were contradicted by more credible evidence, particularly, her parents' accounts. Defendant also points to Hannah's delayed disclosure; failure to disclose to friends, doctors, teachers, or the investigators looking into the unrelated incident involving defendant; and inability to recall certain details. However, all these issues were raised by defense counsel during questioning or closing arguments and were therefore presented to the jury. See State v. J.L.G., 234 N.J. 265, 305 (2018) (explaining that the jury can consider the child sexual assault victim's explanation for delayed disclosure). "The jury is free to believe or disbelieve a witness's testimony." State v. Saunders, 302 N.J. Super. 509, 524 (App. Div. 1997). According great deference to the jury's opportunity to view the victim's demeanor and assess her credibility as we are obligated to do, we are not persuaded that the verdict was against the weight of the evidence.

Equally unavailing is defendant's contention that "the impending government shutdown" occasioned by COVID-19 improperly influenced the jury's verdict. In support, defendant points to the fact that the jury "sent a note to the judge that they were not unanimous on one charge," and then "returned a verdict of guilty on all three counts less than fifteen minutes later." In dismissing defendant's contention, the judge found nothing "unusual" about the sequence of events. According to the

13

judge, "there[ was] nothing . . . happening . . . that would suggest that it had anything to do with the urgency of leaving the courthouse due to COVID-19."

The judge explained further that although "we were close to closing down the courthouse," "nobody brought up the COVID issue." According to the judge,

> at the time that this was taking place, there was no indication verbally, physically or otherwise from the jurors that they were anxious about getting out of th[e] courthouse.
>
> Whatever the atmosphere might have been out on the street, inside th[e] courtroom it was totally calm, quiet and professional . . . . There was no indication . . . from anybody that they were anxious to get out of [the courthouse].

We discern no basis to question the judge's ruling and agree with the State that defendant's argument is unfounded and based on "abject speculation."

### III.

In Point II, defendant argues he is entitled to a new trial because he received ineffective assistance of trial counsel. He asserts his attorney failed to investigate and impeach Hannah based on sexual abuse allegations she made against several of defendant's friends, including J.R., who had lived with the family off and on; failed to cross-examine Hannah on contradictory statements she made to police and internal inconsistencies in her statements; and failed to

14

challenge certain portions of Hannah's statements to police that were unrecorded.

In support, defendant submitted with his new trial motion certifications from Lisa, J.R., and his new defense attorney explaining that J.R. "had a distinguishing tattoo on his penis" that would have discredited Hannah's statement to police that there was no tattoo on his genitalia. J.R. also certified that he "never had any kind of sexual relations" with Hannah. Photographs of the tattoo were included with the certifications.

The new defense attorney's certification also relayed discussions he had had with defendant and Lisa, during which the couple stated that prior trial counsel had attributed his decision to not cross-examine Hannah on certain issues to his desire to avoid "creat[ing] sympathy for her with the jury."[4] However, there were no affidavits or certifications from defendant or prior counsel included with the new trial motion. See State v. Szemple, 247 N.J. 82, 101 (2021) ("Rule 1:6-6 permits the submission of affidavits in support of motions 'based on facts not appearing of record or not judicially noticeable,' and

---

[4] See People v. Foulkes, 117 A.D.3d 1176, 1177 (N.Y. App. Div. 2014) (recognizing that vigorous cross-examination of child sexual assault victim can have the undesirable effect of "alienating the jury").

case law reveals that such affidavits have been pivotal in post-conviction discovery decisions . . . .").

"Ineffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." State v. Preciose, 129 N.J. 451, 460 (1992). Thus, "[o]ur courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." Ibid.

Although the judge recounted the extensive cross-examination conducted by trial counsel and found no deficiency in counsel's performance, we believe defendant's ineffective-assistance-of-counsel (IAC) claims are better suited for consideration on a more fulsome record. Accordingly, we decline to consider the claims on direct appeal and dismiss the IAC claims without prejudice to the filing of a proper post-conviction relief petition and an evidentiary hearing, if appropriate. "Such a proceeding would be the appropriate forum to evaluate the strategy of defendant's trial counsel . . . and other issues requiring information that is not in the record before the [c]ourt." State v. McDonald, 211 N.J. 4, 30 (2012).

Additionally, defendant argues he is entitled to a new trial based on newly discovered evidence – a podcast interview Hannah gave in 2020, on a program called, "Soul Power to the People," and an internet article she wrote and posted on Facebook in 2021, titled, "I am a Survivor: [Hannah's] Story (Part One)." The interview and the article both contain additional allegations that, according to defendant, "contradicted her prior allegations, contradicted other credible testimony from her parents," and create "doubts about the veracity of Hannah's account."

A defendant seeking a new trial based on newly discovered evidence must demonstrate that the new evidence is: "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." State v. Nash, 212 N.J. 518, 549 (2013) (quoting State v. Carter, 85 N.J. 300, 314 (1981)). All three prongs must be satisfied before a new trial is warranted, State v. Ways, 180 N.J. 171, 187 (2004), and defendant bears the burden of establishing each, State v. Smith, 29 N.J. 561, 573 (1959).

"Material evidence" under the first prong is "'any evidence that would have some bearing on the claims being advanced,' and includes evidence that

17

supports a general denial of guilt."  Nash, 212 N.J. at 549 (quoting Ways, 180

N.J. at 188).  In other words, the new evidence must "have the probable effect

of raising a reasonable doubt as to the defendant's guilt" to "not be considered

merely cumulative, impeaching, or contradictory."  Ibid. (quoting Ways, 180

N.J. at 189).   In this sense, the first and third prongs are "inextricably

intertwined," and "'evidence [that] would shake the very foundation of the

State's case and almost certainly alter the earlier jury verdict' could not be

categorized as 'merely cumulative.'"  Ibid. (alteration in original) (quoting Ways,

180 N.J. at 189).

In considering the motion, the judge described the newly discovered

evidence as follows:

> [T]he podcast talks about child trafficking and details
> some of [Hannah's] experience in that regard and her
> suggestions as to how people can potentially identify
> victims of this type of trafficking.
>
> And the story, [Hannah's] story that was written,
> talks about her life and cites year after year of an
> incident of sexual abuse that occurred to her.  Both . . .
> contain far more claims of sexual abuse than were
> presented at . . . trial.
>
> [And there are f]ar more claims of sexual abuse
> . . . than were included in the [i]ndictment.

A-0014-21

The judge found "there[ was] no dispute that both of these items were newly discovered" because "[t]hey were not created prior to the time that th[e] trial took place," thus establishing the second prong of the Carter test. However, according to the judge, defendant failed to meet the other two Carter requirements. The judge explained that defendant's argument was that the new evidence would alter the earlier jury verdict because the new evidence would "impeach [Hannah] and really show how far-fetched her thoughts are, how far-fetched her claims are, and how she should be discredited." The judge continued that "in order to reach that conclusion, . . . you[ would] have to assume that the information in the podcast and/or in the story are false."

She reasoned:

> The problem with that is that we have no way of knowing how people would react to that information were it produced at trial. Some may agree with the defense['s] argument that things are so far-fetched I[ am] not believing anything. Others may be horrified and it may underscore their belief in what [Hannah] had to say.
>
> It[ is] hard to know. It[ is] also hard to know to what extent that information would be admissible in the context of a new trial. There would certainly be a lot of argument about that prior to it[] being presented to a jury.
>
> So having said all of this, this newly discovered evidence as it is, is not something that would contradict

the claims made by [Hannah] during the trial. She did not recant what she said happened to her at ages four, eight and fifteen. She made new claims about not only her father but other people.

And I find that it[ is] impossible to find, frankly, that if a new trial were granted and this evidence were somehow presented to the new jury, the jury's verdict would probably be different and, therefore, the [m]otion for a [n]ew [t]rial is denied.

We discern no abuse of discretion in the judge's ruling. Putting aside the question of admissibility, the new evidence is at best "merely cumulative or impeaching or contradictory[,]" Carter, 85 N.J. at 314, and does not justify a new trial. Indeed, even defendant characterizes the newly discovered evidence as impeachment evidence. During the interview, Hannah alleged that her father would repeatedly tie her up and rape her in a barn and traffic her to other men. In addition to being trafficked and raped in a barn, Hannah alleged she was abused by her paternal grandfather and miscarried a child fathered by defendant. Further, she asserted in the article that she was physically abused by her father and told by her father that her sexual abuse was normal.

Rather than being contradictory as defendant claims, the new evidence presents additional allegations of sexual assault that are largely consistent with the allegations made at trial and are consistent with Hannah's claims regarding when the abuse started and how long it lasted, as well as where she lived when each of the

20

various assaults occurred. Consistent with her trial testimony, Hannah recounted in the interview that the molestation "started" when she was four, "started to get really bad" when she was eight, and ended on her fifteenth birthday when defendant raped her for "the last time." The article contains a similar chronology of events. Therefore, the new evidence is not of the sort that would probably change the jury's verdict in the event of a new trial. Because defendant failed to satisfy the first and third prongs of the Carter analysis, the motion was properly denied.

IV.

In Point III, defendant argues that the judge abused her discretion "by not granting [defense] counsel's contemporaneous request for a mistrial or [defendant's] subsequent new trial motion[] based on the prosecutor's questioning of Lisa about the [ACME] receipt." According to defendant, "on cross-examination, the prosecutor asked Lisa if she had gone back in her banking records or receipts from her trip to [ACME] on Hannah's fifteenth birthday 'to help [defendant].'" Because Lisa admitted that "she had done so" but "neither banking records nor a receipt from the [ACME] trip were admitted into evidence," defendant contends "a fair implication was that neither helped [defendant]." Defendant contends that the implication "created an inference that Lisa suppressed proof that would have undermined her husband's case," and

21

impermissibly "shift[ed] the burden to the defense to produce evidence." Defendant asserts the error was compounded by the fact that the sidebar discussion on the issue was inaudible and was never "reconstructed to allow for the appropriate level of scrutiny on appeal."

"We review the trial court's denial of defendant's motion for a mistrial in accordance with a deferential standard of review." Jackson, 211 N.J. at 407.

> The grant of a mistrial is an extraordinary remedy to be exercised only when necessary "to prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997). For that reason, an appellate court should not reverse a trial court's denial of a mistrial motion absent a "clear showing" that "the defendant suffered actual harm" or that the court otherwise "abused its discretion." State v. LaBrutto, 114 N.J. 187, 207 (1989).
>
> [State v. Yough, 208 N.J. 385, 397 (2011).]

As previously stated, a motion for a new trial is also "addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." Russo, 333 N.J. Super. at 137. Likewise, "[w]hether testimony or a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly

22

within the competence of the trial judge.'" Yough, 208 N.J. at 397 (quoting State

v. Winter, 96 N.J. 640, 646-47 (1984)).

In defending her decision to deny defendant's request for a mistrial based

on Lisa's testimony about the ACME receipt, as well as support the denial of the

related motion for a new trial following the verdict, the judge stated:

> Defendant argues that during cross-examination, the State asked [Lisa] whether she tried to investigate the matter after learning of the allegations in June 2017.
>
> Defendant contends that this was a violation of his right to remain silent and that it gave [the] jury the impermissible impression and inference that . . . [d]efendant, through his wife, had an obligation to immediately defend himself and that the failure to do so was evidence of guilt.
>
> The State contends, as it did during trial, that the questions went to [Lisa's] credibility and her bias for [d]efendant and did not violate [d]efendant's right to remain silent.
>
> . . . .
>
> It is undisputed that a [d]efendant has no obligation to prove his innocence or to offer any proof of his innocence. The question and answer at issue here did not create an impression to the contrary. The question was asked in response to [Lisa's] testimony that [Hannah] had been at the [ACME] with her.
>
> [Lisa] agreed that an important fact was whether she was with [Hannah] the entire time [Hannah] was at the trailer. The [p]rosecutor's inquiry about a record

23

from [ACME] had the purpose of determining whether [Lisa] had any proof from [ACME] that would support that she was there and that [Hannah] was with her.

This was a legitimate question and[,] in its context, was clearly designed to challenge the credibility of [Lisa], as well as to demonstrate her bias for [d]efendant.

The questions posed by the [p]rosecutor did not create an impermissible inference that . . . [d]efendant, through his wife, had a duty to conduct an investigation to defend himself.

The jury was told both during the preliminary instruction and the final instruction that it is not the obligation or the duty of [a] [d]efendant in a criminal case to prove his innocence or offer any proof relating to his innocence.

There is no basis for this [c]ourt to conclude that the challenged testimony caused the jury to disregard this important instruction. Further, the [c]ourt cannot conclude that a manifest denial of justice will occur if the [m]otion is not granted on these grounds.

We agree and affirm the judge's decision on this issue substantially for the reasons expressed by the judge. "The trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is in issue," State v. Sanchez, 224 N.J. Super. 231, 251 (App. Div. 1988), and

24

proof of bias is a proper area to attack a witness' credibility,[5] <u>State v. Holmes</u>, 290 N.J. Super. 302, 313 (App. Div. 1996). Moreover, "[g]iven the trial court's comprehensive charge explaining the presumption of innocence," we do not find that the line of cross-examination "denied defendant a fair trial." <u>State v. Loftin</u>, 146 N.J. 295, 389 (1996).

Equally unavailing is defendant's invocation of error based on the inaudible sidebar discussion on the issue. The judge confirmed that "[the sidebars] were, in fact, recorded" but were "not audible because [of] the background filter noise." From her notes, the judge recounted both defense counsel's objection to the questioning about the ACME receipt and defense counsel's request for a mistrial on the issue.

According to the judge,

> [t]hat occurred while [the prosecutor] was questioning [Lisa] about the trip to the [ACME] and[,] in that context, asked her whether there were any receipts to verify that trip to the [ACME].
>
> [Defense counsel] objected. We went to sidebar. I heard [defense counsel's] objection, which basically was that it would create the impression that [Lisa] was

---

[5] We also note that there could be no prejudice to defendant occasioned by Lisa not presenting proof of the ACME trip because Hannah testified that Lisa usually went to ACME for groceries and did not dispute that Lisa went to ACME on that date.

creating a defense for her husband and that he had an obligation to defend himself.

I found, after hearing from [the prosecutor] as well, that that was not correct. In the context of the trial itself, the way that [the prosecutor] had led up to that point in his questioning, the topics that had been . . . discussed, it was apparent that he was talking about can you, [Lisa], verify you went to the [ACME]?

So . . . at that time, I overruled the objection and did not give a curative instruction, not seeing a need for one at the time.

Shortly thereafter, [the prosecutor] raised the point of bank records. There was another objection. We went to sidebar.

The argument was made that, again, this was potentially interfering with [d]efendant's right not to speak or prepare a defense, making it seem that he had to prepare a defense, and I indicated that that objection would be sustained.

We are satisfied that the absence of a verbatim record of the sidebar discussion "does not interfere with our appellate review" and we discern no reversible error. State v. Paduani, 307 N.J. Super. 134, 143 (App. Div. 1998). First, "[t]he absence of a verbatim record merely raises a question of fairness that must be addressed. It does not render a trial unfair." State v. Bishop, 350 N.J. Super. 335, 347 (App. Div. 2002) (citation omitted) (citing State v. Izaguirre, 272 N.J. Super. 51, 56 (App. Div. 1994)). Second, "in cases where

26

portions of the trial were missing, this court has placed a duty upon the defendant to show both an exercise of due diligence to correct the deficiency in the record and prejudice from the incompleteness of the record." Ibid. (citing Paduani, 307 N.J. Super. at 142).

Here, defendant cannot establish prejudice. Because the judge clarified and recounted with specificity what occurred during the inaudible sidebar discussions, "[w]e are readily able to discern each issue discussed and, from counsel's conduct following the sidebar, the purpose of the sidebar and the judicial ruling which prompted counsel's subsequent conduct or question." Paduani, 307 N.J. Super. at 143. Moreover, failure of defendant to attempt to reconstruct the record in accordance with Rule 2:5-3(f), as occurred here, "precludes him . . . from alleging reversible error." Bishop, 350 N.J. Super. at 347-48 (citing Paduani, 307 N.J. Super. at 142).

V.

In Point IV, for the first time on appeal, defendant argues counts two and three, alleging sexual abuse when Hannah was ages eight and four, respectively, should have been severed for trial purposes from count one, which charged him with the sexual assault that occurred on Hannah's fifteenth birthday. He asserts the inclusion of all three counts in one trial was "unduly prejudicial."

27

"Joinder is permitted when two or more offenses 'are of the same or similar character or are based on . . . [two] or more acts or transactions connected together or constituting parts of a common scheme or plan.'" State v. Morton, 155 N.J. 383, 451 (1998) (omission in original) (quoting R. 3:7-6).

> Mandatory joinder is required when multiple criminal offenses charged are "based on the same conduct or aris[e] from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court."
>
> Notwithstanding the preference for joinder, Rule 3:15-2(b) vests a trial court with discretion to order separate trials if joinder would prejudice unfairly a defendant. The rule provides:
>
>> If for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment or accusation the court may order an election or separate trials of counts . . . or direct any other appropriate relief.
>
> [State v. Chenique-Puey, 145 N.J. 334, 340-41 (1996) (alteration and omissions in original) (citations omitted) (first quoting R. 3:15-1(b); then citing State v. Oliver, 133 N.J. 141, 150 (1993); and then quoting R. 3:15-2(b)).]

Where offenses are properly joined, "[the] defendant bears the burden of demonstrating prejudice" to warrant severance. State v. Lado, 275 N.J. Super.

28

140, 149 (App. Div. 1994). However, "the potential for prejudice inherent in the mere fact of joinder does not of itself encompass a sufficient threat to compel a separate trial." State v. Scioscia, 200 N.J. Super. 28, 42 (App. Div. 1985). Instead, the "key factor in determining whether prejudice exists from joinder of multiple offenses 'is whether the evidence of [those] other acts would be admissible in separate trials under [N.J.R.E. 404(b)].'" State v. Krivacska, 341 N.J. Super. 1, 38 (App. Div. 2001) (alterations in original) (quoting State v. Moore, 113 N.J. 239, 274 (1988)). "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than [the defendant] would in separate trials.'" Chenique-Puey, 145 N.J. at 341 (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

Under a N.J.R.E. 404(b) analysis, other-crime evidence "is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." N.J.R.E. 404(b)(1). "The purpose of the rule is to ensure that juries do not convict defendants . . . because the defendants' [other] crimes make the jury perceive them to be bad people in general." State v. DiFrisco, 137 N.J. 434, 498 (1994) (citing State v. Cofield, 127 N.J. 328, 336 (1992)).

29

However, N.J.R.E. 404(b) "permits admission of [other-crime] evidence when relevant to prove some fact genuinely in issue." Krivacska, 341 N.J. Super. at 39. To that end, such evidence may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b)(2). "[W]here there is a course of conduct on the part of a defendant such as to make evidence of one transaction relevant to any other transaction for the purpose of establishing motive, intent or common scheme or plan, then the trial judges may properly deny severance." Coruzzi, 189 N.J. Super. at 299.

To resolve N.J.R.E. 404(b) disputes,

> [o]ur Supreme Court has adopted a four-part test in determining the admissibility of other[-] crime . . . evidence. Specifically, the evidence must be: (1) admissible as relevant to a material issue, (2) similar in kind and reasonably close in time to the act alleged, (3) clear and convincing, and (4) of sufficient probative value not to be outweighed by its apparent prejudice.
>
> [Krivacska, 341 N.J. Super. at 39-40 (citation omitted) (citing Cofield, 127 N.J. at 338).]

Because defendant did not move for severance before trial as required by Rule 3:15-2(c) and Rule 3:10-2(c), we review his claim under the plain error standard, namely, "whether under the circumstances of [this] case the alleged error possessed

a clear capacity for producing an unjust result." State v. Keely, 153 N.J. Super. 18, 22 (App. Div. 1977); see also State v. Blakney, 389 N.J. Super. 302, 326 (App. Div.), rev'd on other grounds, 189 N.J. 88 (2006) (explaining that where a defendant waited until after the trial to argue that joinder of the crimes charged was prejudicial, the plain error standard of review applied). Because we are satisfied that the trial of all three counts together was proper under a Cofield analysis, defendant's belated severance argument fails, as does any finding of plain error.

As to the first Cofield factor, the evidence of each offense was relevant to demonstrate a continuous course of conduct for the purpose of establishing a plan or common scheme. In State v. Garrison, the defendant was convicted of several counts of aggravated sexual assault and related offenses stemming from him sexually abusing his girlfriend's eleven-year-old daughter in both New Jersey and Alabama during the child's summer break. 228 N.J. 182, 186-88 (2017). The abuse included sexual contact, digital penetration, and vaginal intercourse. Id. at 187.

Prior to trial, the defendant moved to exclude certain evidence, including evidence of a strip poker game that took place in Alabama. Id. at 186. The trial court admitted the evidence as intrinsic evidence, and this court reversed defendant's convictions on the ground that the evidence was not admissible as

intrinsic evidence or under Rule 404(b). Id. at 186-87. Our Supreme Court reversed, holding that evidence that the defendant was involved in a strip poker game in Alabama with the child victim and the victim's younger sister was admissible under Rule 404(b) as relevant to the defendant's

> plan to further desensitize [the victim] to sexual conduct so that he could continue to abuse her. See, e.g., State v. DeVincentis, 47 P.3d 606, 610 (Wash. Ct. App. 2002) ("One reason the common scheme or plan exception arises in prosecutions alleging sexual abuse of children is that such crimes often occur only after the perpetrator has successfully used techniques designed to obtain the child's cooperation."), aff'd, 74 P.3d 119 (Wash. 2003).
>
> [Garrison, 228 N.J. at 196 (citations reformatted).]

In that regard, the Garrison Court distinguished State v. J.M., 225 N.J. 146 (2016), relied on by defendant here. Garrison, 228 N.J. at 196. In J.M., the defendant, "a massage therapist, was charged with sexually assaulting a customer while giving her a massage." 225 N.J. at 150. On the State's pre-trial motion, the trial court admitted evidence under Rule 404(b) "that defendant had committed a similar sexual assault while working as a massage therapist in Florida," "even though defendant had been acquitted of the prior crime." Ibid.

In distinguishing J.M., the Garrison Court explained:

> In J.M., . . . we held that a witness's testimony regarding a prior bad act was "inadmissible to establish motive,

intent, or absence of mistake because [the] defendant's state of mind [was] not a 'genuinely contested' issue" when the defendant maintained that no sexual assault occurred. 225 N.J. at 160 [(quoting State v. Willis, 225 N.J. 85, 99 (2016))]. Unlike the defendant in J.M., defendant in this case has not merely denied that a sexual assault took place. Defendant has repeatedly asserted that any inappropriate actions originated with the victim. Defendant's reliance on J.M. is therefore unavailing as the circumstances of that case are readily distinguishable.

[Garrison, 228 N.J. at 196 (first and second alterations in original).]

Likewise, the circumstances of this case are readily distinguishable from J.M. and more akin to Garrison. Only a complete recitation of the entire course of conduct could put in context how defendant had desensitized Hannah to the abuse so that she did not reject or resist defendant's advances as she grew up. Evidence of the continuous abuse also proved opportunity, a material fact that defendant and Lisa contested and vehemently disputed by repeatedly denying that defendant was ever alone with Hannah because of his work. See Oliver, 133 N.J. at 153 (holding that other-crime evidence "would be admissible to show the feasibility of the proposition that defendant could sexually assault women in his room without other household members hearing or seeing anything unusual," an issue the defense raised by "introduc[ing] the testimony of various household

33

members that they had not heard any fighting or screaming on the evenings of the alleged assaults").

As to the second Cofield factor, our Supreme Court has declared that it was "pertinent to the facts" presented in Cofield, a drug case, and "cases that replicate the circumstances in Cofield," but "need not receive universal application in Rule 404(b) disputes." State v. Williams, 190 N.J. 114, 131 (2007). Here, because "application of prong two serves no beneficial purpose . . . , we disregard it as unnecessary." Ibid. As to the third Cofield factor, given the jury's finding that defendant was guilty of all three offenses by proof beyond a reasonable doubt, clearly Hannah's credible testimony was beyond the "clear and convincing" standard of proof required under Cofield. 127 N.J. at 338.

Finally, regarding the fourth Cofield factor, "'[e]vidence claimed to be unduly prejudicial is excluded only when its "probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation" of the issues in the case.'" State v. Long, 173 N.J. 138, 163-164 (2002) (alteration in original) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)). "[O]ur courts have not frequently excluded highly prejudicial evidence under the fourth prong of Cofield." Long, 173 N.J. at 162.

Here, counts two and three were not so prejudicial as to warrant exclusion under Cofield's prong four analysis. On the contrary, their inclusion enabled Hannah "to provide a coherent explanation of defendant's continuous conduct, depicting her perception of what occurred because '[y]oung children often "do not think in terms of dates or time spans."'" Garrison, 228 N.J. at 198 (alteration in original) (quoting State v. L.P., 338 N.J. Super. 227, 239 (App. Div. 2001)). Moreover, in the context of the record as a whole, it is unlikely that the evidence associated with counts two and three had "'a probable capacity to divert the minds of the jurors' when far more prejudicial evidence was presented" in count one. Id. at 199 (quoting Long, 173 N.J. at 164). Thus, the trial of all three counts was far more probative than prejudicial.

## VI.

In Point V, defendant argues he should be resentenced because "the victim impact statements . . . contained improper information and came from an unidentified source who was not the victim," and "the aggravating factors related to the offender and not the offense."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute

35

[our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, defendant was sentenced to fifteen years, subject to NERA, on count one, and a concurrent ten-year-NERA sentence each on count two and three. In imposing sentence, the judge found aggravating factors three, six, and nine based on the high risk of re-offense, the extent of defendant's prior criminal record, and the need for deterrence, respectively. See N.J.S.A. 2C:44-1(a)(3), (6), (9). Based on the "character and attitude" of defendant, the judge also found mitigating factor nine, see N.J.S.A. 2C:44-1(b)(9), but, after qualitatively balancing all the factors, concluded that "the aggravating factors outweigh[ed] the mitigating factor[]." See Fuentes, 217 N.J. at 72-73 ("The sentencing court does more than quantitatively compare the number of pertinent aggravating factors with the number of applicable mitigating factors; the relevant factors are

qualitatively assessed and assigned appropriate weight in a case-specific balancing process.").

In support, the judge acknowledged "[t]he results of the examination at the Adult Diagnostic [and] Treatment Center," which "found [defendant's] conduct to be repetitive and compulsive," as well as defendant's prior criminal history, which included a prior conviction for endangering the welfare of a child, subjecting him to Megan's Law.  See State v. Cassady, 198 N.J. 165, 180 (2009) ("[A]n appellate court is bound to affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." (quoting State v. O'Donnell, 117 N.J. 210, 215 (1989))).

Although defendant's prior criminal history qualified him for extended term sentencing as a persistent offender, see N.J.S.A. 2C:44-3(a), the judge denied the State's motion for an extended term, sentencing him instead to an aggregate sentence in the middle of the ordinary sentencing range for a first-degree offense. See Fuentes, 217 N.J. at 73 ("[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend

toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

We are satisfied the judge meticulously adhered to the applicable sentencing principles in imposing the sentence. We reject as belied by the record defendant's contention that the judge committed error in identifying the applicable aggravating factors. On the contrary, the judge adhered to our Supreme Court's dictate that the foundation of the sentencing analysis "is a thorough understanding of the defendant and the offense." Id. at 71.

We also reject defendant's argument that the judge erred by considering Hannah's victim impact statement referring to additional acts of sexual abuse by defendant's friends at defendant's behest as well as the victim impact statement of a non-victim.[6] We acknowledge that "other than defendants, and crime victims or their survivors, there is no absolute right to speak at a sentencing proceeding; instead, permitting others to address the court directly is a matter entrusted to the sentencing court's discretion." State v. Blackmon, 202 N.J. 283, 305 (2010). However, there is absolutely no evidence in the record to suggest

---

[6] In its merits brief, the State identifies the non-victim as Hannah's aunt. In her statement, the aunt described the impact of defendant's crimes on Hannah and the rest of the family.

that the judge considered either Hannah's additional allegations or the non-victim's statement in fashioning the sentence.

In sum, applying our deferential standard of review, we are satisfied the sentence was in accord with the sentencing guidelines; was based on a proper weighing of the factors; was supported by competent, credible evidence in the record; and does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

39